IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL BOND,                              :
                                           :      Civil Case No. 4:05-CV-859
          Plaintiff,                       :
                                           :
     v.                                    :
                                           :      (Judge McClure)
TOWN OF BLOOMSBURG,                        :
                                           :
          Defendant.                       :

**M E M O R A N D U M**

April 20, 2006

## BACKGROUND:

On April 28, 2005, plaintiff Michael Bond ("Bond") filed a one-count

complaint in the Middle District of Pennsylvania.  Bond asserts in his complaint that

when defendant Town of Bloomsburg ("Bloomsburg" or the "Town") terminated

his employment they violated the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 et seq..

On March 7, 2006, defendant Town of Bloomsburg filed the instant motion

for summary judgment.  The matter is now fully briefed and ripe for our decision.

For the following reasons the court will grant defendant's motion for summary

judgment and enter judgment in favor of defendant Town of Bloomsburg and

1

against plaintiff Michael Bond.

**DISCUSSION:**

## I. LEGAL STANDARD

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).


In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party. Am. Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, 578 (3d Cir. 1995). The nonmoving party, however, cannot defeat a motion for

summary judgment by merely offering general denials, vague allegations, or

conclusory statements; rather the party must point to specific evidence in the

record that creates a genuine issue as to a material fact.  See Celotex, 477 U.S. at

32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.

1999).

## II. FACTUAL BACKGROUND

### A.  Local Rule 56.1

First, we note that defendant complied with Local Rule 56.1 and submitted a

statement of undisputed material facts in the form of short and concise numbered

paragraphs supported by citations to the record.  (Rec. Doc. No. 17.)  Plaintiff has

also filed a counter-statement of undisputed material facts in similar form.  (Rec.

Doc. No. 28-2.)  Unfortunately, plaintiff's counter-statement of material facts fails

to comply with the procedure set forth in Local Rule 56.1.  Local Rule 56.1

provides in relevant part that:

> The papers opposing a motion for summary judgment
> shall include a separate, short and concise statement of
> the material facts, responding to the numbered paragraphs
> set forth in the statement required in the foregoing
> paragraph [relating to the moving party's statement of
> material facts], as to which it is contended that there
> exists a genuine issue to be tried.

Local Rule 56.1 (emphasis added).

Plaintiff's counter-statement of material facts is not set forth in a responsive

manner.  Defendant's statement contains ninety-eight (98) paragraphs while

plaintiff's counter-statement contains only nineteen (19) paragraphs.  We will

develop the uncontested factual background from both parties' statements of

material facts, despite plaintiff's failure to comply with the procedure established

by the Local Rules.  However, we remind plaintiff that "[a]ll material facts set forth

in the statement required to be served by the moving party will be deemed to be

admitted unless controverted by the statement required to be served by the

opposing party."  Local Rule 56.1.

### B.  Undisputed Material Facts

Plaintiff Michael Bond was hired by the Town on July 21, 1997, as an

Operator/Laborer in the Department of Public Works ("DPW").  As a Laborer,

Bond was required to a perform a variety of tasks.  These tasks included operation

of equipment, trash removal, installation and repair of sewer lines, manual work on

sidewalks and curbs, patching of pot holes, changing of traffic lights, and any

manual work related to the maintenance of the Town's streets.  According to the

job description the Operator position "requires strenuous physical effort and

exposure to uncomfortable working conditions where manual laboring duties are

involved."  (Rec. Doc. No. 22, Ex. E, at 1.)  The Town's job description also

includes that a required ability for the operator position is "sufficient physical strength and freedom from disabling defects to lift heavy objects and work under adverse weather conditions."  (Rec. Doc. No. 22, Ex. E, at 2.)

In 2002-03, the Town employed approximately fifty employees and five Labor/Operators.  Bond's supervisor was John Barton, the superintendent of the DPW.  Bond's work included being sent to other departments within the Town to perform tasks as needed.  While working in other departments, plaintiff was supervised by individuals other than Barton.

On June 4, 2002, Plaintiff injured his left knee while performing curbside work in the Recycling Center.  After his injury, Bond treated with Dr. Gregory Fanelli, an orthopedic surgeon.  Bond had treated with Dr. Fanelli previously, and personally selected him to be his physician for his June 2002 injury.  After Bond's injury in 2002, Dr. Fanelli recommended surgery for plaintiff.  While waiting for surgery Bond returned to work in a light duty capacity.

Bond underwent an interarticular revisional anterior cruciate ligament reconstruction by Dr. Fanelli on his left knee on July 5, 2002.  On September 20, 2002, an Independent Medical Examination ("IME") of Bond was conducted by Dr. Mark Holencik. (Rec. Doc. No. 22, Ex. E, at 5-7.)  At that time Dr. Holencik also completed a restriction capabilities form for Bond which indicated that Bond's

4

injuries were temporary.  (Rec. Doc. No. 22, at Ex. E., at 4.)  Bond also recalled

that Dr. Holencik limited his work capacity to "light duty" (Rec. Doc. No. 18, Ex.

A, at 15);[1] Dr. Holencik's September 20, 2002 restrictions form, however, has the

definition of "sedentary work" circled and not "light duty."  (Rec. Doc. No. 22, Ex.

E., at 4.)  Dr. Holencik's September 20, 2002 letter stated that "[a]t this point I

would not consider allowing him to resume normal industrial activity until he has

something resembling a normal range of motion."  (Rec. Doc. No. 22, Ex. E, at 6.)

Dr. Holenchik felt that it would take three to five months of recovery before Bond

could consider any more vigorous activity.  (Rec. Doc. No. 22, Ex. E, at 6.)

After his surgery, on October 7, 2002, Bond returned to work at the same

rate of pay he was earning prior to going out on leave.  The Town offered Bond the

light duty job of Operator that included the tasks of answering phones, sweeping

floors, and performing general cleaning duties.  (Rec. Doc. 22, Ex. E, at 8.)  When

no work that fell within Bond's medical restrictions was available, plaintiff was sent

---

[1]Under deposition, Bond also stated that he did not remember discussing

"light duty" work with Dr. Holencik.  (Rec. Doc. No. 18, Ex. A, at 18.)  Bond

agreed with the restrictions placed upon him after his surgery, with the exception

that he did not see the connection between the restriction to avoid exposure to dust

and fumes and his knee injury.  (Rec. Doc. No. 18, Ex. A, at 17.)

to do work in the Recycling Department or Town Hall.  After his knee injury, Bond

received mixed work assignments from several of the Town's departments; e.g.,

Bond worked in the DPW approximately fifteen percent of the time and worked in

light duty at Town Hall approximately thirty-five percent of the time.

On December 23, 2002, a Functional Capacity Evaluation Form was

performed on Bond at Geisinger Health South Rehabilitation Center by Louise

Litzy, P.T..  (Rec. Doc. No. 22, Ex. E, at 9-11.)  Litzy concluded that Bond was

"safely capable of performing work in the **Medium** work demand level with

limitations on left lower extermity usage (i.e. foot/leg controls, balancing, squatting).

This does not meet the requirements of his present job."  (Rec. Doc. No. 22, Ex.

E, at 11) (emphasis in original).  Bond agreed with Litzy's assessment.

On January 21, 2003, Dr. Fanelli examined Bond and completed a new job

restrictions form for plaintiff.  (Rec. Doc. No. 22, Ex. E, at 12.)  Dr. Fanelli

restricted plaintiff to medium duty at the most.  (Rec. Doc. No. 22, Ex. E, at 14.)

Specifically, Dr. Fanelli restricted plaintiff to only occasional lifting of any weight of

30 pounds; one hour per work day of walking and driving to work; two hours per

work day of standing; three hours per work day of sitting; occasional bending and

squatting; and occasional exposure to moving machinery.  (Rec. Doc. No. 22, Ex.

E, at 12.)  Dr. Fanelli also completely restricted Bond from crawling or climbing

6

ladders.  (Rec. Doc. No. 22, Ex. E, at 12.)  Consistent with Bond's earlier work restrictions, Dr. Fanelli indicated that these restrictions were temporary.  (Rec. Doc. No. 22, Ex. E, at 12.)  Under deposition, Bond admitted the requirements of his job exceeded the limitations placed on him by Dr. Fanelli in January 2003.  Bond also admitted that he agreed with Dr. Fanelli's assessment of his limitations, except for his limitation on climbing ladders.[2]

On June 5, 2003, the Town requested that Bond produce an updated physical capacities report outlining his limitations.  During the summer of 2003, Bond had been temporarily reassigned to the Recycling Center.  On July 14, 2003, Carol Mas, the Town's Director of Finance, directed plaintiff back to light duty work assignments in the DPW.  (Rec. Doc. No. 22, Ex. F.)  Although Bond did not believe he was performing "light duty" work, he did not contact Mas to correct

---

[2]We agree with defendant that the record is inconsistent on Bond's assessment of his ability to climb ladders.  Bond states at different points in time, even contradicting himself under deposition, that he was and was not capable of climbing ladders because of the condition of his knee.  (Compare Rec. Doc. No. 18, Ex. A, at 30 with Rec. Doc. No. 18, Ex. A, at 31 & Rec. Doc. No. 22, Ex. E, February 3, 2003 Case Management Report, at 14 ("He further informed us that he was fearful of climbing, due to the possibility of falling.").)

her characterization of his work.  (Rec. Doc. No. 18, Ex. A, at 38.)

In response to the Town's request for an updated physical capacities form, Bond instead obtained a script dated July 21, 2003 from Dr. Fanelli that read in part as follows:

> Patient will require <u>permanent</u> restrictions for work
> including those previously outlined for light duty.  Patient
> would best be served with relatively sedentary work.

(Rec. Doc. No. 22, Ex. E, at 17) (emphasis in original).[3]

Contrary to Dr. Fanelli's assessment, Bond claimed at his deposition that he was

---

[3]Another document in the record is Dr. Fanelli's clinic notes from Geisinger dated July 21, 2003.  That document states in relevant part:

> Also of note is we are going to keep him on permanent
> light-duty and really, he needs to have a job change or go
> on disability from the construction industry.

(Rec. Doc. No. 22, Ex. E, at 18.)  Defendant indicates it is not clear from testimony when the note was produced to the Town.  Examining the record in the light most favorable to the nonmoving party, we assume that defendant had this note at the time they terminated Bond. There is good reason for the court to make this assumption as a Town official indicated that the Town relied on the text of Dr. Fanelli's clinic notes in their decision to terminate Bond's employment in an April 22, 2004 letter.  (Rec. Doc. No. 22, Ex. E, at 39.)

"capable of being part of every task that we ever done in my six and half previous years of employment with the exception of heavy lifting." (Rec. Doc. No. 18, Ex A, at 35.)  Nevertheless, Bond admits that he agreed with Fanelli's assessment that sedentary work would "definitely be better for the knee in the long term." (Rec. Doc. No. 18, Ex. A, at 40-41.)  Plaintiff admits that he was instructed to use his knee to "his tolerance" and to "take it easy as a preventative measure." (Rec. Doc. No. 18, Ex. A, at 36.)

Bond admits that he never contacted Dr. Fanelli at any time to dispute his assessment of plaintiff's conditions and limitations.  Nevertheless, at his deposition Bond took the position that he is not impaired as described by Dr. Fanelli.  Instead, Bond asserts that his only limitations beginning in February or March 2003 and continuing to present day are lifting and carrying "heavy" weights.

On August 1, 2003, after receiving Dr. Fanelli's script, Robert Grey, writing on behalf of the Town, contacted Bond again requesting an "updated list of physical limitations/capabilities." (Rec. Doc. No. 22, Ex. A, at 19.)  This same information was requested in the Town's June 5, 2003 letter to Bond, and the August 1, 2003 letter noted that the Town had still not received a list from Bond. On August 5, 2003, Dr. Fanelli produced a letter "To Whom It May Concern" that ultimately was produced to the Town. (Rec. Doc. No. 22, Ex. E, at 21.)  That

9

letter elaborated on Bond's limitations as follows:

> Given the degree of degenerative changes in the knee, Mr.
> Bond should be allowed some restrictions in regards to
> his work activity.  Specifically, he should only carry
> objects weighing 25# [sic] or less occasionally and
> should also work on ladders only on an occasional basis.
> He is allowed to stand and walk to his tolerance.  He has
> no restrictions with driving.  It is difficult to predict how
> his knee will respond to activity on a day-to-day basis,
> therefore, Mr. Bond should be allowed some input in
> regards to how specific work activities might affect his
> knee.

(Rec. Doc. No. 22, Ex. E, at 21.)  Plaintiff admits that this note placed restrictions

upon his ability to work as an Operator for the Town and that he never expressed

to Dr. Fanelli any disagreement with the doctor's assessment.

At his deposition Plaintiff stated that:

> [I]t was my understanding that if there was something that
> I didn't feel comfortable doing, to let [Barton] know . . .
> that I shouldn't be doing that.  Or if I was doing
> something that maybe I thought I should do and was
> having problems, to let them know that that is something
> I'm having problems with.

(Rec. Doc. No. 18, Ex. A, at 45-46.)

Consistent with Bond's understanding of his work situation, if Bond was assigned

to jobs that he believed he could not perform, he would inform his supervisor or

some other Town official.  (Rec. Doc. No. 18, Ex. A, at 22-23, 84.)

On August 5, 2003, Bond was scheduled for an IME on September 5, 2003 at the request of the insurance company handling his worker's compensation claim. The IME was later rescheduled for October 3, 2003.

In August 2003, Bond met with Administrative Assistant Diana Wagner and Town Administrator Bob Grey to discuss his limitations.  At that time, Bond was asked to create a list of duties that he believed he could perform on the job. Plaintiff responded that "there's really not a whole lot that I'm not doing."  (Rec. Doc. No. 18, Ex. A, at 34.)  At his deposition Bond testified that there were no points in time during the day in August 2003 when he had to break from his work for his knee, or to refrain from standing or walking.  (Rec. Doc. No. 18, Ex. A, at 36-37, 48.)  Nevertheless, on August 18, 2003, Bond was assigned to light duty in the Recycling Department.  Plaintiff was unable to perform the light duty assignment because it required getting in and out of a truck repeatedly and carrying recyclable items.

On August, 28, 2003, Wagner wrote a letter to Bond explaining that the Town did "not have a policy of keeping individuals on light duty on a permanent basis."  (Rec. Doc. No. 22, Ex. E, at 23-24.)  The letter was written after Wagner had met with Bond and in response to Dr. Fanelli's July 2003 script that imposed permanent restrictions on Bond.  The letter again requested that Bond's doctor

11

complete a Physical Capacities Form to provide the town with the exact restrictions and an opinion as to the permanence of those restrictions. (Rec. Doc. No. 22, Ex. E, at 23.) Wagner also asked Bond "to provide [the Town] with any and all requests for a reasonable accommodation." (Rec. Doc. No. 22, Ex. E, at 23.)

At his deposition, Bond admitted that he failed to provide any requests for accommodations. (Rec. Doc. No. 18, Ex. A, 55-56.) Bond also admitted that although he disagreed with Wagner's characterization of the work he was doing as "light duty" he did not correct Wagner. Yet, Bond also admitted that he did not believe he was being restricted from performing any jobs that he could have been doing. (Rec. Doc. No. 18, Ex. A, at 44, 54-55.) Bond has characterized his "position" as "there were other jobs that he could have done but were not assigned to him, such as grinding mulch and tree trimming." (Rec. Doc. No. 28-2, at 2, ¶ 5.) Bond was able to do 95% of the job requirements of his position. Bond's supervisor Barton indicated under deposition that there were never times when there were no job tasks for Bond to do from the various departments, but that there were times when there were no light duty jobs available for him in the DPW department.

On September 10, 2003, Grey informed Bond that the Town Council was going to have a meeting at which they would vote whether to lay Bond off from his job. (Rec. Doc. No. 18, Ex. A, at 57.) Despite being informed of his likely lay-off,

Bond admits that he did not approach Barton, Wagner, Mas, or any other Town

employee to convey his belief that he was not, in fact, performing light duty.  (Rec.

Doc. No. 18, Ex. A, at 57-60.)

On September 11, 2003, Mayor Charles Coffman wrote to Bond informing

him that Council laid Bond off from his position with the Town.  (Rec. Doc. No.

22, Ex. E, at 25.)  In relevant part the letter states:

> Council's decision is based on the note received by Dr.
> Gregory Fanelli dated July 21, 2003, which stated that
> you would require permanent restrictions for work.  We
> have accommodated you since your surgery with the
> belief that you would be able to resume the normal duties
> of your position, however according to Dr. Fanelli, this
> will not be the case.  Therefore, we are unable to
> accommodate your restrictions any longer and are
> terminating you from your employment with the Town of
> Bloomsburg.

(Rec. Doc. No. 22, Ex. E, at 25.)  Although Bond disagreed with the assessment,

he admits that he did not contact Mayor Coffman to discuss the basis for his lay-

off, because he thought it would be a "waste of [his] energy."  (Rec. Doc. No. 18,

Ex. A, at 62-63.)

Even though Bond believed he was not performing light duty work at the

time of his lay-off, he admits that at that time he was not capable of performing all

of his job duties.  (Rec. Doc. No. 18, at 64.)  At his deposition Bond stated that at

the time of his lay-off he was employable only in a "moderate" or "medium" capacity, (Rec. Doc. No. 118, Ex. A, at 80), and that he was "always" going to be restricted because of his knee.  (Rec. Doc. No. 118, Ex. A, at 81.)  After Bond's lay-off, Dr. Fanelli and Dr. Duda produced reports as to Bond's limitations as had been earlier requested.  Both doctors concluded that Bond continued to be sharply limited in his ability to work as an Operator.  (Rec. Doc. No. 22, Ex. E, at 26-29.)

Plaintiff admits that at the time he was laid off, there were no open jobs available with the Town for which Bond could have performed all the duties.  (Rec. Doc. No. 18, Ex. A, at 71.)  Bond's Operator position was eliminated after his lay-off and he was never replaced.

On April 22, 2004, Wagner wrote to Bond's attorney encouraging Bond to apply for any open positions with the Town for which he was qualified; at the time there were no open positions with the Town.  (Rec. Doc. No. 22, Ex. E, at 39-40.)

## III. BOND'S ADA CLAIM (COUNT I)

Bond's complaint alleges that when the Town terminated his employment it violated the ADA.  The complaint asserts two definitions of disability for theories of recovery under the ADA.  First, Bond asserts he had a "record of impairment" upon which defendant terminated his employment.  (Rec. Doc. No. 1, at 3, ¶ 15.) Bond also states that the Town had the "perception that Plaintiff suffered from a

14

disability," i.e, the "regarded as" definition of disability.  (Rec. Doc. No. 1, at 3, ¶

15.)  In his brief in opposition to defendant's motion for summary judgment, Bond

withdrew his claim that he had a record of impairment, and only proceeds on the

"regarded as" definition of disabled.  (Rec. Doc. No. 28, at 5.)

## A.  ADA Framework

The ADA seeks to protect individuals with disabilities from discrimination by

employers.  See 42 U.S.C. § 12101(b).  Because Bond relies on indirect evidence,

he bears the initial burden of establishing a prima facie case of disability

discrimination under the burden-shifting framework of McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973), by a preponderance of the evidence.  See St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Shellenberger v. Summit Bancorp,

Inc., 318 F.3d 183, 187 & n.5 (3d Cir. 2003); Bearley v. Friendly Ice Cream Corp.,

322 F. Supp. 2d 563, 574 (M.D. Pa. 2004).

To establish a prima facie case under the ADA, Bond must demonstrate that

he: (1) is disabled within the meaning of the ADA; (2) was qualified to perform the

essential functions of his job, with or without accommodation; and (3) suffered an

adverse employment decision because of discrimination.  See Williams v. Phila.

Housing Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (citing Taylor v.

Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).  In order to make out a

prima facie case, Bond must demonstrate each of those elements by a preponderance of the evidence. Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 668 (3d Cir. 1999). In order to survive the instant motion for summary judgment, Bond must demonstrate that there is sufficient evidence for a reasonable factfinder to find a prima facie case of discrimination. Celotex Corp., 477 U.S. at 322-23 (Summary judgment is mandated when the nonmoving party "fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial.").

As discussed below, Bond has provided insufficient evidence to create a genuine issue as to a material fact, i.e., a prima facie case of discrimination. Bond cannot demonstrate that he is a qualified individual under the ADA. Furthermore, we agree with defendant's argument that Bond's requested accommodation is unreasonable.

## B.  Bond Cannot Demonstrate that the Town Regarded Him as Having an Impairment that Substantially Limits One or More Major Life Activities

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); see 29 C.F.R. § 1630.2(g). Importantly, simply having an

16

impairment that does not substantially limit a major life activity is not a disability, and therefore is not covered by the ADA.  See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).

Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(i).  Major life activities are "those basic activities that the average person can perform with little or no difficulty."  29 C.F.R. Pt. 1630, App. § 1630.2 (I).

A "substantially limiting" impairment is an impairment that renders an employee "unable to perform a major life activity that the average person in the general population can perform," or that significantly restricts the employee as to "the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j); see Toyota, 534 U.S. at 195-96. Pertinent factors for the court to consider include: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  29 C.F.R. §§ 1630.2(j)(2)(i)-(iii); see Toyota, 534 U.S. at

196.

"The question of whether an individual is substantially limited in a major life activity is a question of fact." Williams, 380 F.3d at 763.  The Third Circuit follows the EEOC's interpretive guidelines to determine if a plaintiff is substantially limited in one or more major life activities; this approach necessitates that we conduct a two-step analysis.  Peter v. Lincoln Technical Inst., Inc., 255 F. Supp. 2d 417, 431 (E.D. Pa. 2002) (citing Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998)).  Step one is to determine if the plaintiff is substantially impaired in a major life activity other than working.  If the court finds that the plaintiff is substantially impaired in the first step, then the inquiry ends.  If not, then the court turns to the second step of determining whether the plaintiff is limited in the major life activity of working.  Mondzelewski, 162 F.3d at 783; see, e.g., Merit v. Se. Pa. Transit Auth., 315 F. Supp. 2d 689, 698 (E.D. Pa. 2004) (Rufe, J.).

We now turn specifically to the "regarded as" definition of disability.  In Tice v. Centre Area Transportation Authority, the United States Court of Appeals for the Third Circuit stated in relevant part:

> For an individual to be "disabled" under the "regarded as" portion of the ADA's definition of disability, the individual must demonstrate either that: (1) despite having

18

> no impairment at all, the employer erroneously believes
> that the plaintiff has an impairment that substantially limits
> major life activities; or (2) the plaintiff has a nonlimiting
> impairment that the employer mistakenly believes limits
> major life activities.

247 F.3d 506, 514 (3d Cir. 2001) (citing Sutton, 527 U.S. at 489).  The court then

noted that the definition of "substantially limits," along with its application to the

major life activity of working, is the same when it is applied under the "regarded as"

definition as it is under other portions of the ADA.  Id. (citations omitted); see also

Rineheimer v. Cencolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002).

In discussing liability under the "regarded as" prong of the ADA, the United

States Court of Appeals for the Third Circuit has noted that not all mistaken

perceptions about employees' restrictions are actionable.  In Taylor v. Pathmark

Stores, Inc., the Court of Appeals stated in relevant part:

> An employer can rely on an employee's information about
> restrictions, but it has to be right when it decides that
> those restrictions are permanent and that they prevent the
> employee from performing a wide class of jobs, as
> opposed to one particular and limited job.  An employer
> who simply, and erroneously, believes that a person is
> incapable of performing a particular job will not be liable
> under the ADA.  Liability attaches only to a mistake that
> causes the employer to perceive the employee as disabled
> within the meaning of the ADA, i.e., a mistake that leads
> the employer to think that the employee is substantially
> limited in a major life activity.

177 F.3d 180, 191-92 (3d Cir. 1999) (emphasis added).  Thus, an employer's mere

awareness of an employee's impairment alone, is insufficient to show the employer

regarded the employee as disabled or that the perception caused the adverse

employment action.  Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996).

In the instant case, Bond's counsel has advanced only one argument against

defendant's motion for summary judgment.  Bond's counsel asserts that the Town,

as a result of Bond's knee injury and Dr. Fanelli's July 21, 2003 notes, regarded

Bond as disabled from a broad class of jobs based on his knee injury.  (See Rec.

Doc. No. 28, at 6-7) ("Bloomsburg . . . regarded Bond as being unable to work in a

variety of type of jobs.")  Plaintiff places great significance on Dr. Fanelli's July 21,

2003 clinic notes.  The relevant sentence in that note states:

> Also of note is we are going to keep him on a permanent
> light duty, and really, he needs to have a job change or go
> on disability from the construction industry.

(Rec. Doc. No. 22, Ex. E, at 18) (emphasis added).

Essentially, Bond asserts that he should survive the summary judgment

motion because Dr. Fanelli references the construction industry in his clinic notes

which in turn are referenced in his termination letter.  Plaintiff asserts that the

construction industry includes a "variety of types of jobs including carpentry,

20

plumbing, excavating, masonry, and electrical work." (Rec. Doc. No. 28, at 11.)[4]

Bond's counsel asks us to make an unreasonable inference from the facts before

the court. Based on the record as a whole no reasonable jury could find that the

Town regarded Bond as disabled within the meaning of the ADA. The termination

---

[4]Although Bond briefs his argument under the indirect evidence burden-

shifting framework first set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973), in light of the succinct rebuttal advanced in his brief in opposition, we

note that Bond's termination letter did not constitute direct evidence of

discrimination.

As the Third Circuit recently reiterated, to succeed on a direct evidence

theory, "the evidence must demonstrate that the 'decision makers placed

substantial negative reliance on an illegitimate criterion in reaching their decision.'"

Anderson v. Consol. Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002) (quoting

Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)). Bond cannot

clear this "high hurdle" with his termination letter, because the letter does not

"reveal a sufficient discriminatory animus" to relieve Bond of his burden of

establishing a prima facie case. Id. (quotations omitted). As we note above, the

letter simply indicates that because Bond needed permanent restrictions for work

the Town was no longer able to accommodate his restrictions with light duty work.

letter indicates that the Town believed Bond was unable to perform the job of operator with or without reasonable accommodation.  Just because Bond was precluded from performing his job of choice does not mean he is disabled within the meaning of the ADA's definition of disabled.  Sutton, 527 U.S. at 491; see 29 C.F.R. § 1630.2 (j)(3)(i); see also Cade v. Conrail, No. 95-5941, 2002 U.S. Dist. LEXIS 8131, at *45 (E.D. Pa. May 8, 2002) ("the fact that [the employer] might have regarded the plaintiff as unable to work in a single job . . . is not evidence that [the employer] regarded plaintiff as substantially limited in the major life activity of working"); Jordan v. Stanziola, No. 00-1915, 2002 U.S. Dist. LEXIS 27334, at *29-31 (M.D. Pa. May 15, 2002) (Caputo, J.).  Bond has not submitted evidence from which a reasonable jury could infer that the Town regarded him as disabled under the ADA.

## C.  Duty to Accommodate Does Not Include Transforming a Temporary Light Duty Position Into A Permanent Position

We agree with defendants that the facts of the instant case are largely similar to our recent decision in Harman v. Rafferty, No. 04-2027, 2005 U.S. Dist. LEXIS 39614 (M.D. Pa. July 26, 2005) (McClure, J.).  In that case we also found that the plaintiff failed to establish a prima facie case of discrimination and further noted that the ADA did not require the accommodation he had sought, i.e., the

conversion of a temporary light duty position into a permanent position.  In the instant case Bond asserts that he should have been able to continue to receive work assignments from a variety of departments so as to avoid heavy lifting.  As we noted in Harman, the United States Court of Appeals for the Third Circuit has repeatedly stated that the "ADA does not require an employer to create a new position in order to accommodate an employee with a disability, or transform a temporary light duty position into a permanent position."  Turner v. Hershey Chocolate, USA, 440 F.3d 604, 614 (3d Cir. 2006) (citing Buskirk v. Apollo Metals, 307 F.3d 160, 169 (3d Cir. 2002)).

Furthermore, assuming arguendo that Bond was able to prove that he was a qualified individual under the ADA, which he has not, Bond has admitted that there was no vacant funded position with the Town for which he was qualified to perform the essential duties of the position with or without reasonable accommodation.  A "regarded as" plaintiff still must show the existence of such a vacant position in order to demonstrate a prima facie case.  See Williams, 380 F.3d at 770, 772.  Bond has repeatedly argued that his temporary mixed work assignment arrangement should have continued, and that there was always work available from one of the departments that he was doing work for that he could do. The Town is not obligated to create a position for which he could perform the

23

essential functions with or without accommodation, nor is it obligated to convert a temporary light duty job into a permanent position.  Even if Bond were considered qualified under the ADA, which he is not, the accommodation he seeks is not warranted under the ADA.

**CONCLUSION:**

For the aforementioned reasons, the court will issue an accompanying order entering judgment in favor of defendant Town of Bloomsburg and against plaintiff Michael Bond as to the only count in the complaint.

      s/ James F. McClure, Jr.    
James F. McClure, Jr.
United States District Judge

24

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL BOND,                       :
                                    :        Civil Case No. 4:05-CV-859
            Plaintiff,              :
                                    :
    v.                              :
                                    :        (Judge McClure)
TOWN OF BLOOMSBURG,                 :
                                    :
            Defendant.              :

## O R D E R

April 20, 2006

For the reasons set forth in the accompanying memorandum,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Defendant's motion for summary judgment is granted.  (Rec. Doc.

        No. 15.)

2.      Final judgment is entered in favor of defendant Town of Bloomsburg,

        and against plaintiff Michael Bond.

3.      The clerk is directed to close the case file.


            s/ James F. McClure, Jr.
        James F. McClure, Jr.
        United States District Judge

1